UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>                     Plaintiff,<br>v.<br><br>Tnuza Jamal Hassan,<br><br>                     Defendant. | Case No. 18-cr-26 (PJS/SER)<br><br>REPORT AND<br>RECOMMENDATION |

Andrew R. Winter and Charles J. Kovats, Jr., Esqs., United States Attorney's Office, Minneapolis, Minnesota, for Plaintiff.

Joshua P. Johnson, Esq., Minneapolis, Minnesota, for Defendant.

Robert D. Sicoli, Esq., Sicoli Law, Ltd., Minneapolis, Minnesota, for Defendant.

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case comes before the undersigned on Defendant Tnuza Jamal Hassan's ("Hassan") Motion to Suppress Evidence Obtained as a Result of Searches and Seizures ("Motion to Suppress") [Doc. No. 32]. This matter was referred for the resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends that the Motion to Suppress be denied.

I.      BACKGROUND

On February 2, 2018, a grand jury indicted Hassan with one count of attempting to provide material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1), one count of making a false statement to Federal Bureau of Investigation ("FBI") agents in violation of 18 U.S.C. § 1001(a)(2), and one count of arson in violation of 18 U.S.C. § 844(i). (Indictment) [Doc. No. 1].

Hassan filed several pretrial motions, including the Motion to Suppress, and a hearing was held on April 17, 2018.[1] (Am. Minute Entry Dated Apr. 17, 2018) [Doc. No. 37]. No testimony was received, and the Government introduced the nine search warrants at issue here. *See* (Ex. List) [Doc. No. 40]. Counsel for Hassan declined the Court's offer to submit supplemental briefing and instead asked the Court to conduct a "four corners" review of the nine search warrants to determine whether they lacked probable cause and whether they were overly broad.[2]

The Court first analyzes Search Warrants 1–3 and 5–9 and determines that they are supported by affidavits that contain probable cause and are sufficiently particular.[3] The Court then analyzes Search Warrant 4, directed at YouTube, and concludes Hassan lacks standing to challenge it.

---

[1]   The Court previously issued orders on the nondispositive motions. *See* (Text Only Order Dated Apr. 17, 2018) [Doc. No. 38]; (Order Dated Apr. 18, 2018) [Doc. No. 39]; (Order Dated Apr. 23, 2018) [Doc. No. 43].

[2]   *See United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (stating that when no evidence outside of the affidavit to a search warrant is submitted to the issuing judge, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause" (internal quotation marks omitted)).

[3]   Although an affidavit is attached to each search warrant, some affidavits were used for multiple search warrants. For the sake of clarity, the Court will refer to the search warrants and affidavits by their exhibit number. For example, "Search Warrant 1" refers to the search warrant of the imaged copy of the HTC cellphone, and "Affidavit 1" refers to the affidavit in support of Search Warrant 1. Both Search Warrant 1 and Affidavit 1 were submitted as Exhibit 1. *See* (Ex. List).

All of the affidavits are signed by Uri P. Rosenwald ("Rosenwald"), a special agent with the FBI, who has been assigned to the Joint Terrorism Task Force ("JTTF") of the FBI's Minneapolis Division since August 2012. *See, e.g.*, (Aff. 1 ¶ 2). Rosenwald's duties include investigating "criminal violations relating to terrorism, such as material support to designated foreign terrorist organizations." (*Id.*).

## II.   SEARCH WARRANTS 1–3 AND 5–9

### A.   Legal Standard

The Fourth Amendment provides for the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "To be valid, a search warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband, or a person for whose arrest there is probable cause may be found in the place to be searched." *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998).

#### 1.   Probable Cause

As stated above, where no evidence outside of the affidavit was submitted to the issuing judge, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *Solomon*, 432 F.3d at 827 (internal quotation marks omitted). The issuing judge's "determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks omitted). In other words, "the duty of a reviewing court is simply to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238–39 (cleaned up).

Probable cause exists when the likelihood of finding evidence of a crime in a certain place is fairly probable. *United States v. Chrobak*, 289 F.3d 1043, 1046 (8th Cir. 2002). "Probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (omission in original) (internal quotation marks omitted). In other words, "[p]robable cause exists when the facts and circumstances . . . are

sufficiently trustworthy to warrant a person of reasonable caution to believe that a crime has been committed and that seizable property from that crime may be located at a particular place or on a person to be searched." *United States v. Gipp*, 147 F.3d 680, 687 (8th Cir. 1998). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant." *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007) (internal quotation marks omitted).

### 2. Particularity

Additionally, "[t]he Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched[,] and the persons or things to be seized.'" *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (quoting U.S. Const. amend. IV). This requirement prevents "a general exploratory rummaging through a person's belongings." *United States v. Hibbard*, 963 F.2d 1100, 1102 (8th Cir. 1992) (citing *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)). A warrant that does not meet the particularity requirement is overly broad and invalid, and evidence seized in reliance on the invalid warrant—or invalid portion of the warrant—must be suppressed. *United States v. Timley*, 443 F.3d 615, 622 (8th Cir. 2006).

A court determines whether the particularity requirement is satisfied by looking at "such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) (internal quotation marks omitted). But "[t]he standard used to gauge the particularity requirement of a search warrant is one of practical accuracy rather than a hypertechnical one." *United States v. Cartier*, 543 F.3d 442, 447 (8th Cir. 2008) (internal quotation marks omitted).

B.  Analysis

1.  Search Warrants 1, 2, and 3—Digital Devices

Search Warrants 1, 2, and 3 are for the imaged copy of Hassan's HTC cellphone (Ex. 1), Hassan's Apple laptop (Ex. 2), and Hassan's Blu cellphone (Ex. 3). Because these three search warrants are supported by the same affidavit, the Court discusses them together. *See* (Exs. 1–3).

In Affidavit 1, Rosenwald states the following. In late March 2017, St. Catherine University ("SCU") reported to the FBI that three Muslim women who were students, including Hassan, received a three-page anonymous letter recruiting each person "to become a 'better Muslim' and to wage 'jihad'[4] against military forces of the United States." (Aff. 1 ¶ 14). Each letter was identical, except for the recipient, and appeared to be created on a computer. (*Id.*). Hassan denied writing the letter. (*Id.*).

On September 19, 2017, Hassan left the Minneapolis-St. Paul International Airport ("MSP") and flew to Amsterdam, the Netherlands, and then to Dubai in the United Arab Emirates. (*Id.* ¶ 8). Hassan attempted to fly from Dubai to Kabul, Afghanistan. (*Id.*). Authorities in Dubai, however, did not permit her to board the Kabul flight because she did not have a visa, and they booked her on a flight back to MSP. (*Id.*). When Hassan arrived at MSP on September 22, 2017, she was met by Customs and Border Protection ("CBP") officers. (*Id.* ¶ 9). At this time, officials seized an HTC cellphone from Hassan, performed a cursory examination of the contents, imaged the device for a subsequent and more thorough examination, and returned the phone to Hassan.[5] (*Id.* ¶ 10, ¶ 10 n.1). Upon questioning, Hassan stated that she left the United

---

[4]  "Jihad is an Arabic term for a struggle or a fight against the enemies of Islam." (Aff. 1 ¶ 14 n.8).

[5]  Hassan does not challenge this seizure, and "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *See United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).

States to join the "Islamic Resistance," which she clarified meant that she wanted to join al-Qaida and the Taliban.[6] (*Id.* ¶ 9). She specified where she wanted to travel and that she wanted to study at a specific educational institution—a madrassa—to become a better Muslim. (*Id.* ¶ 11). Hasson said that she learned of the madrassa from a YouTube video titled "Girls of the Taliban," one of several videos Hassan admitted to watching online. (*Id.* ¶ 12). Hassan stated that "she would consider marrying a fighter and support[ing] them by cooking and cleaning." (*Id.*). Hassan said that she "had been encouraged to research Islam more recently by other more extreme videos she has watched, as well as by [the] anonymous recruitment letter." (*Id.* ¶ 13). Hassan again denied being the author of the letter. (*Id.* ¶ 14). Hassan stated that, in order to avoid being caught as she traveled to Afghanistan, she left a Blu-brand cellphone and a SIM card in the ride-share vehicle that took her from SCU to MSP and left her Apple laptop in her dorm room. (*Id.* ¶ 15); *see also* (*id.* ¶ 4). Law enforcement officers recovered the Blu cellphone and the laptop, but were unable to find the SIM card. (*Id.* ¶ 15, ¶ 15 n.9). Hassan stated that "she had watched radical videos online" using both her laptop and cellphone, although she did not specify whether she was referring to her HTC or Blu cellphone. (*Id.* ¶ 15, ¶ 15 n.10).

Hassan later made a statement to members of the JTTF, confirming her statements to CBP. (*Id.* ¶ 16). She also stated that she did not have radical views until she received the recruitment letter, and again stated that she intended to seek out members of al-Qaida and the Taliban. (*Id.* ¶ 17). She was hesitant to state she would commit an act of violence against U.S.

---

[6] The word "al-Qaida" is spelled different ways throughout the affidavits. For ease of reference, the Court uses the spelling "al-Qaida" throughout, regardless of the spelling in the original source. Al-Qaida is a designated foreign terrorist organization. (Aff. 1 ¶ 6).

Hassan was interviewed at this point, and several other times before she was indicted. Hassan does not challenge the admission of these statements in her Motion to Suppress or any other motions pending before the Court.

6

forces in Afghanistan, but later said, "if I was the only one, then I guess, yes." (*Id.*) (internal quotation marks omitted).

The search warrants authorize searches of "[a]ll records" on the three devices that relate to violations of 18 U.S.C. § 2339B (attempt to provide material support to a designated foreign terrorist organization) involving Hassan and any "[e]vidence of user attribution showing who used or owned the Digital Devices at the time the things described in this warrant were created, edited, or deleted . . . ." (*Id.*, Attach. B).

### a.     Probable Cause

The Court finds the above facts establish probable cause. Specifically, Hassan's statements to law enforcement officials establish that she intended to travel to Afghanistan to support al-Qaida and the Taliban. *See* (*id.* ¶ 9). She was inspired to do so by watching radical videos on her laptop and cellphones, the subject of the search warrants. (*Id.* ¶ 15). Under these circumstances, the Court concludes that probable cause existed that evidence regarding Hassan's attempt to provide material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B would be found on these three devices. *See Gipp*, 147 F.3d at 687.

### b.     Particularity

The Court concludes that the affidavit also satisfies the particularity requirement of the Fourth Amendment. The search warrant is limited to searching for two types of information: evidence related to the crime of attempting to aid a foreign terrorist organization, and user attribution information. Hassan admitted to viewing videos from the internet, and that information can be stored for a significant period of time. (Aff. 1 ¶¶ 15, 23–24). Caselaw demonstrates that searches limited to items related to the criminal activity are not overly broad and that searches across a spectrum of digital systems within a device are not overly broad for

7

failing to anticipate where the data is located. *See United States v. Gleich*, 397 F.3d 608, 612 (8th Cir. 2005) (stating that search warrants that "sufficiently limit [law enforcement's] search to the items specifically prohibited by statute" satisfied the particularity requirement); *United States v. Sherman*, 372 F. App'x 668, 675–76 (8th Cir. 2010) (holding that defendant had access to "all components of the computer system used in his business and that the computer data could be manipulated, stored in different formats, or stored outside of the Tracker Program," where the information would most likely be found).

The Court finds Search Warrants 1, 2, and 3 are supported by an affidavit that contains probable cause and is sufficiently particular.

### 2. Search Warrant 5—HTC Cellphone

Exhibit 5 is a search warrant and affidavit for Hassan's HTC cellphone. The affidavit describes the following facts: On January 17, 2018, at about 11:00 a.m., multiple fires were set in various buildings around SCU, including St. Mary Hall, a freshman dormitory. (Aff. 5 ¶ 6). Campus security footage from St. Mary Hall "showed a female with a thin build, dark complexion, black winter jacket, dark books, carrying a plastic [Target] bag enter and leave the dorm shortly before and after the fire started in the first floor lounge area." (*Id.* ¶ 7). The individual dumped a Target shopping bag into a salt bucket outside the building; the shopping bag contained a box of matches similar to the matches found near the fires around the SCU campus. (*Id.*). A short time later, SCU staff found Hassan, who matched the description of the person in the video, locked in the lounge of another dormitory. (*Id.* ¶ 8). In the lounge, investigators found a black jacket that matched the jacket in the video, and a shopping list titled "Target," as well as a receipt from Target. (*Id.*). Hassan was arrested, and during a search of her

person, investigators found the HTC cellphone that appeared to be the same phone as the one imaged at the MSP airport. (*Id.*).

St. Paul Police interviewed Hassan, who admitted that she set the fires. (*Id.* ¶ 9). She believed she had a right to do so because American forces were destroying Muslim schools in Iraq or Afghanistan. (*Id.*). She said she would have preferred to make a bomb, but did not know how. (*Id.*). During this same conversation, Hassan admitted to authoring and delivering "a radical Islamist recruitment letter to two fellow female Muslim SCU students in March of 2017."[7] (*Id.* ¶ 12). The letter directs the recipient to watch two videos available on YouTube. (*Id.*). The day after her arrest, members of the FBI's JTTF interviewed Hassan. (*Id.* ¶ 13). Hassan claimed to follow "Usama Bin Laden's ideologies and aspires to join al-Qaida." (*Id.*). She stated that because "American military forces are killing Muslims, so Muslims are allowed to kill Americans." (*Id.*). She stated that if she cannot leave the country, "she will continue her violent jihad in America," and considers setting fires at SCU an act of jihad. (*Id.*).

The affidavit also reiterates the facts surrounding Hassan's attempt to travel to Afghanistan, including that Hassan admitted to viewing "Internet-based radical material" on her cellphone and laptop that convinced her to travel to Afghanistan. (*Id.* ¶ 14). The results of forensics on Hassan's laptop "included dozens of internet searches for radical Islamist content" before her travel, and the Blu cellphone (i.e, not the one at issue here) demonstrated that Hassan accessed extremist videos from YouTube. (*Id.*). The affidavit also provides facts that suggest Hassan used her HTC cellphone to contact a ride-share service to take her to SCU where the fires were set; to access the internet before setting the fires; and to access radical Islamist material. (*Id.* ¶¶ 15–18). The scope of the search warrant includes records related to importing,

---

[7]  This is the same recruitment letter described above.

manufacturing, distributing or storing explosive materials in violation of 18 U.S.C. § 844 and providing material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B. (*Id.*, Attach. B). These records specifically include: (1) evidence that Hassan participated in planning, preparing, and executing arson and providing support to al-Qaida; (2) documents, files, photographs, and other material that relate to Hassan's conduct with respect to arson and supporting al-Qaida; (3) communications that may show Hassan's motive, intent, role, and predisposition to these actions; (4) any information related to Hassan's schedule of travel from October 6, 2017, to the present; and (5) financial records. (*Id.*). The scope also includes user attribution information and records related to internet use. (*Id.*).

Search Warrant 5 includes a copy of Affidavit 1, which was the imaged copy of the same device. *See* (*id.* ¶¶ 8, 15–18). Affidavit 1 established probable cause and is sufficiently particular as it relates to evidence that Hassan attempted to provide aid to a foreign terrorist organization. Since then, Hassan appears to have continued to use this cellphone, and admitted to setting fires at SCU. Affidavit 5, which includes Affidavit 1, provides additional information that shows that the HTC cellphone is likely to contain evidence related not only to aiding a foreign terrorist organization, but also to arson. Therefore, the Court concludes that the affidavit contains probable cause and is not overly broad for similar reasons discussed in the analysis related to the image of this cellphone.

### 3.   Search Warrants 6 and 7—Hassan's Google Accounts

Exhibits 7 and 8 are search warrants and supporting affidavits for Google accounts associated with Hassan's SCU and Google email addresses.[8] (Aff. 6 ¶¶ 1, 28). The same affidavit supports both search warrants and recounts the facts related to the anonymous recruitment letter

---

[8] Google hosts online services for SCU, including email and other Google services. (Aff. 6 ¶ 28).

Hassan received, her attempted travel to Afghanistan, and subsequent interviews. (*Id.* ¶¶ 9–21). The affidavit also states that Hassan's laptop showed that she attempted to access the Google account associated with her email address and actively used her SCU email before February 25, 2017.[9] (*Id.* ¶ 22). The affidavit describes search history related to al-Qaida on the laptop and images of "the black flag of Tawheed, masked militants raising rifles in the air, fighter jets, and one image of the burning Twin Towers on September 11, 2001" from Hassan's abandoned Blu cellphone.[10] (*Id.* ¶¶ 23–24). The affidavit also recounts the series of events that led to Hassan's arrest for the fires at SCU. (*Id.* ¶¶ 25–26).

The affidavit seeks copies of information in the associated Google services for each account, including documents, storage, groups, chatting, social media, and photos. *See* (*id.*, Attach. B-1). That information will then be searched for information related to: (1) evidence that Hassan participated in planning, preparing, and executing arson, providing support to al-Qaida, and making false statements; (2) documents, files, photographs, and other material that relate to Hassan's conduct with respect to arson, supporting al-Qaida, and making false statements; (3) communications that may show Hassan's motive, intent, role, and predisposition to these actions; (4) evidence of how the Google accounts were used; (5) evidence of the user's state of mind related to the crimes under investigation; (6) the identity of the person who created or used the user identification, including records related to that person's location. (*Id.*).

---

[9]  "[T]he laptop contains no activity after February 25, 2017," which may be because "the user of the laptop may have deleted the more recent history." (Aff. 6 ¶ 22).

[10]  The affidavit acknowledges that the images on the Blu cellphone "may have automatically downloaded to the phone's memory from websites visited by the phone's user." (Aff. 6 ¶ 24 n.9). The significance of the "black flag of Tawheed" is not clear from the affidavit. *See* (*id.* ¶ 24).

### a.   Probable Cause

The Court concludes that the facts described in the affidavit demonstrate probable cause that evidence related to arson, aiding a foreign terrorist organization, and false statements may be found in Hassan's Google accounts. Hassan admitted to attempting to provide material assistance to al-Qaida, setting the fires at SCU, and writing the recruitment letter. (Aff. 6 ¶¶ 11, 13, 26). Hassan's laptop revealed an internet history associated with searches related to al-Qaida. (*Id.* ¶ 23). That same laptop showed active use of Hassan's SCU account. (*Id.* ¶ 22). Additionally, the user attempted to log into the Google account associated with Hassan's Gmail address. (*Id.*). Although the attempts were unsuccessful, the attempts demonstrate a reasonable inference that the user previously had access to the account and continued to believe she had access to the Google account associated with Hassan's Gmail address. Thus, the Court concludes that it was fairly probable that evidence related to arson, supporting a foreign terrorist organization, and making false statements would be found in Hassan's Google accounts.

### b.   Particularity

Affidavit 6 requests permission to search across a variety of Google services, but it is limited to seeking evidence related to Hassan's alleged crimes. As stated above in connection with the searches of Hassan's digital devices, a failure to anticipate where data may be located does not render a search warrant overly broad. *See Gleich*, 397 F.3d at 612. Thus, for the same reasons discussed with respect to Search Warrants 1, 2, and 3, the Court concludes that the search warrants of Hassan's Google accounts are not overly broad.

### 4.   Search Warrant 9—Hassan's Gmail Account

Exhibit 9 is a search warrant and supporting affidavit for the emails in Hassan's Gmail account. The difference between this search warrant and Exhibit 7 is that Exhibit 7 was directed

toward Google services, such as storage, documents, and photos, but Exhibit 9 is directed towards emails specifically. Apart from the places to be searched, the supporting affidavits in Exhibits 8 and 9 are not materially different. The Court concludes the affidavit in Exhibit 9 is supported by probable cause and is not overly broad for the same reasons described with respect to Exhibits 6 and 7 above.

### 5. Search Warrant 8—Package

Exhibit 8 is a search warrant and accompanying affidavit for a package addressed to Hassan at the apartment she shared with her mother. (Aff. 8 ¶¶ 4–5). The return address bears the name "Imran N. Hosein," whose address is listed in Malaysia. (*Id.* ¶ 4). Local officials had made Hassan's arrest and detention public, and when the package arrived, the apartment property manager contacted the FBI. (*Id.* ¶ 5). The affidavit explains that, following Hassan's attempt to travel to Afghanistan, she told law enforcement officials that Sheik Imran Hosein ("Hosein") and others "were sources of information for the development of her religious beliefs." (*Id.* ¶ 13). In particular, the affiant stated that Hassan's statements about Hosein's discussion of the Taliban and al-Qaida "contributed meaningfully to Hassan's decision to attempt to join al-Qaida in Afghanistan." (*Id.*). In addition, Hosein's name "appeared frequently in the Internet search history" of Hassan's abandoned laptop before she attempted to travel to Afghanistan, and the results led her to various YouTube videos. (*Id.* ¶ 14).

The Court concludes that there is probable cause to support Search Warrant 8. The return address is from Hosein, who contributed to Hassan's decision to join al-Qaida. Further, the package is addressed to Hassan, who admitted to learning about Hosein and his beliefs before attempting to join al-Qaida and setting fire to various buildings at SCU. Thus, it is fairly

probable that evidence related to Hassan's attempts to join and interest in supporting al-Qaida would be found in the package.

Further, the warrant is sufficiently particular. It seeks to open only the package and to only look for information related Hassan's planning, preparation, and execution of arson, attempt to support al-Qaida, and make false statements, as well as her motives. (Aff. 8, Attach. B).

**III.   SEARCH WARRANT 4—YOUTUBE**

The affidavit in support of the search warrant directed to YouTube describes how the affiant, Rosenwald, learned that Hassan accessed certain YouTube videos. *See* (Aff. 4). It repeats the same facts as the affidavits described above as they relate to the anonymous letter and Hassan's travel. (*Id.* ¶¶ 7–14). It also specifically identifies the two links in the anonymous letter. (*Id.* ¶ 15). The letter invites the recipient to learn more about "al-Qaida, Taliban, [and] Al-Shabaab," and directs the recipient to "[l]isten to Anwar Al Awlaki on YouTube," and provides the first link. (*Id.*) (internal quotation marks omitted). It states "[t]his is the reason why the United States killed him. Because he speaks the truth." (*Id.*) (internal quotation marks omitted). It quotes several verses from the Qur'an and directs the recipient to watch another link "for inspiration." (*Id.*). The links to the videos in the anonymous letter are "dead links," meaning they are no longer publically available, likely because YouTube removed them. (*Id.*).

The internet search history from Hassan's laptop from dates that were before the anonymous recruitment letter was delivered contains one of the links in the letter. (*Id.* ¶ 18). Both Hassan's "search history and the [anonymous] recruitment letter contain references to topics such as: which countries live under sharia law; U.S. forces killing civilians in Iraq and Yemen; organizations known as al-Shabaab, al-Qaida, and the Taliban; and black flags from

14

Khorasan."[11] (*Id.*) (internal quotation marks omitted). Hassan's internet history also demonstrated that she began researching al-Qaida and other terrorist organizations "long before the letter was delivered," including viewing several videos on YouTube. (*Id.* ¶ 19).

The search warrant was sought because the affiant believed that the anonymous recruitment letter would "provide relevant evidence of Hassan's intent at the time she attempted to travel to Afghanistan to join the 'Islamic Resistance,'" and would "aid in determining whether or not Hassan was the author of the anonymous recruitment letter." (*Id.* ¶ 20).

The Court concludes Hassan does not have standing to challenge this search warrant. "Because [F]ourth [A]mendment rights are personal, a person challenging a search warrant must demonstrate that he or she has a legitimate expectation of privacy in the area searched. By establishing a legitimate expectation of privacy, the person establishes his or her standing to challenge the search." *United States v. Wiley*, 847 F.2d 480, 481 (8th Cir. 1988) (internal citation omitted). There is nothing in the affidavit or search warrant that suggests that Hassan has a legitimate expectation of privacy in video links stored and retained by YouTube, and Hassan has made no argument that she does. Therefore, the Court concludes that Hassan lacks standing to challenge this search warrant.

## IV.   RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Tnuza Jamal Hassan's Motion to Suppress Evidence Obtained as a Result of Searches and Seizures [Doc. No. 32] be **DENIED**.

---

[11]   Khorasan is a region of Afghanistan where "al-Qaida is known to operate and have a significant current presence." (Aff. 4 ¶ 10 n.3).

Dated: May 8, 2018

                                          *s/Steven E. Rau*
                                          STEVEN E. RAU
                                          United States Magistrate Judge

**Notice**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).